## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL RIVERA,                    )
                                   )
                    Plaintiff,     )
          vs                       )          Civil Action No. 2:22-716
                                   )
JOHN WETZEL, et al.,               )          Magistrate Judge Patricia L. Dodge
                                   )
                    Defendants.    )

### MEMORANDUM OPINION

Plaintiff Michael Rivera ("Rivera"), a prisoner who is in the custody of the Pennsylvania Department of Corrections ("DOC"), brings this civil rights action against Defendants, former DOC Secretary Jeffrey Beard ("Beard"), former DOC Secretary John Wetzel ("Wetzel") and Tabb Bickell ("Bickell"), the former DOC Executive Deputy Secretary for Institutional Operations ("EDSI"). He asserts claims under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983 arising out of his conditions of confinement, specifically, the eight and a half years he has spent on the Restricted Release List ("RRL").

Pending before the Court is Defendants' motion for summary judgment. For the reasons below, the motion will be granted in part and denied in part.[1]

### I.    Procedural History

Rivera commenced this action on December 20, 2021 in the United States District Court for the Eastern District of Pennsylvania. It was later transferred to this Court by agreement of the parties. The original Complaint named Wetzel and George Little, who was then the Secretary of the DOC, but an Amended Complaint filed on October 14, 2022 removed Little as a defendant

---

[1] The parties have consented to full jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF Nos. 15, 16.)

and added defendants Beard and Bickell (ECF No. 21).

Federal question jurisdiction is based on the civil rights claims, which Rivera asserts under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. 28 U.S.C. §§ 1331, 1343.

On June 12, 2024, Defendants filed a motion for summary judgment (ECF No. 57), which has been fully briefed (ECF Nos. 58, 63).

## II. <u>Relevant Factual Background</u>

Beard served as the DOC Secretary from February 11, 2003 until August 20, 2010, and Wetzel was the DOC Secretary from 2011 to October 2021. Bickell served as the EDSI from 2018 until his retirement in March 2023. (Defendants' Statement of Material Facts Not in Dispute ("DSMF") ¶¶ 1-3) (ECF No. 59.)

Rivera was incarcerated at the State Correctional Institution at Dallas ("SCI Dallas") from April 19, 2011 to March 17, 2016. On January 26, 2015, he was placed in the Restricted Housing Unit ("RHU") in Administrative Custody ("AC") at SCI Dallas because of his assault of a corrections officer with a combination lock which left the officer permanently disabled and disfigured. As provided in DC-ADM 802, the criteria for placing an inmate in AC included, among other things, that "the inmate has been charged with, or is under investigation for a violation of facility rules, and there is a need for increased control pending disposition of charges or completion of the investigation." (ECF No. 60-1 Ex. 5.) Rivera later entered a guilty plea in the Court of Common Pleas of Luzerne County to a charge of aggravated assault in conjunction with this incident. (DSMF ¶¶ 4-8.)

On November 24, 2015 a DC-46 Vote Sheet was circulated requesting for Rivera to be placed on the RRL based on this attack. At that time, the criteria under DC-ADM 802 for placing

an inmate on the RRL included assaultive history against staff. On January 26, 2016, Wetzel

signed the vote sheet approving Rivera's placement on the RRL. (DSMF ¶¶ 12-14.)

On March 17, 2016, Rivera was transferred to the State Correctional Institution at Fayette

("SCI Fayette"). (*Id.* ¶ 8.) He was housed in the RHU on AC status and informed that he would

remain in solitary confinement indefinitely because he had been placed on the RRL. In May

2019, Rivera was transferred to SCI Benner Township. He was later transferred to SCI Phoenix,

SCI Greene and SCI Camp Hill, remaining on AC status on the RRL throughout. (Rivera Decl.

¶¶ 5-6, 8-9) (ECF No. 65 Ex. B.)

> For inmates on AC status, DC-ADM 802 provides in relevant part that:

> The [Program Review Committee] shall review the status of each inmate in AC
> status every seven days for the first two months. Each inmate in AC status shall
> be seen weekly by his/her counselor. The Unit Management Team shall review
> the status of every inmate in AC after 30 days and every 30 days thereafter. .
> .After the first 60 days, the PRC shall interview every inmate in AC status every
> 90 days unless the Unit Management Team recommends an earlier review. The
> PRC's decision to continue the inmate in AC status or release him/her to
> population shall be documented on a DC-141, Part 4 with a copy provided to the
> inmate.

> Rivera testified that he had meetings with the Program Review Committee ("PRC") every

ninety days while on the RRL. (ECF No. 65-1 at 23.) He participated in them, asked questions

and received responses to his inquiries. (*Id.*) During PRC meetings, inmates would be permitted

to challenge their placement on the RRL. (ECF No. 65-3 at 3; ECF No. 65-4 at 7.) They could

also provide a writing expressing their views to the central office, unit teams, PRC or the

superintendent. (*Id.*)

An inmate's continued placement on the RRL must be reviewed annually. The criteria for

this review are provided in Part 4(B) of DC-ADM 802, which states in relevant part as follows:

> An inmate identified on the RRL may not be released from a Security Level (SL)
> 5 Housing Unit or transferred to another facility without the written approval of
> the Secretary/designee. The PRC may make a recommendation to the Facility

Manager/designee if it is believed that an inmate on the RRL could be safely released to general population or to a Specialized Housing Unit. If the Facility Manager recommends that an inmate be released from the RRL, the Restricted Release List Placement/Annual RRL Review/Removal Request Form (refer to Attachment 1-A) will be completed requesting removal; it will be forwarded, along with a current Psychological Evaluation, to the Regional Deputy Secretary for review indicating approval/disapproval. The Regional Deputy Secretary will forward the Restricted Release List Placement/Annual RRL Review/Removal Request Form to the Executive Deputy Secretary for review of the recommendation; indicating approval/disapproval. The Executive Deputy Secretary will forward the Restricted Release List Placement/Annual RRL Review/Removal Request Form to the Secretary/designee. The Secretary/designee will make the final determination regarding the inmate's removal from the RRL.

DC-ADM 802(4)(B)2-4.

On January 24, 2017, the PRC conducted an annual review and circulated a vote sheet to determine whether to continue Rivera's placement on the RRL. The individuals who vote include unit team members, correctional staff, counselors, the program manager, deputy superintendents and the superintendent. (ECF No. 65-5 at 41.) On January 30, 2017, Rivera was approved by the Superintendent or Designee for continued placement on the RRL, as the policy required at that time. (DSMF ¶ 15.)

The same process was repeated in 2018, 2019, 2020 and 2022. Wetzel provided final approval for the decisions in 2018, 2019 and 2020. Bickell provided final approval in 2022 as the policy required at that time. (*Id.* ¶¶ 16-20.)[2]

Rivera acknowledges that these annual votes occurred, but states that whether this satisfied the due process requirements of the Fourteenth Amendment is a material issue of fact that can be resolved only by a jury. In particular, he notes that neither the Vote Sheets nor DC-ADM 802 provide the opportunity to be heard by the final decision maker about his placement or

---

[2] With respect to 2021, Defendants state only that the vote sheet was circulated. Their exhibit indicates that, on February 22, 2021, the Superintendent or Designee approved Rivera's continued placement on the RRL. However, the document does not contain a signature by either Wetzel or Bickell indicating final approval of this decision. (ECF No. 60 Ex. 13.)

continuation on the RRL and he was not provided this opportunity. (Plaintiff's Response to Defendants' Concise Statement of Fact ("PRDCSF") ¶¶ 12-21) (ECF No. 64.) He also notes that Wetzel did not sign the 2017 or 2021 vote sheets indicating his final approval as the policy required. (*Id.* ¶ 29.)

As of the filing of the Amended Complaint on October 14, 2022, Rivera had spent eight and a half years in conditions amounting to solitary confinement, the vast majority under "administrative custody" on the RRL. According to Rivera, although the name of his program had been changed to the "Intensive Management Unit" ("IMU"), he was still on the RRL. (Rivera Dep. 12:17-13:1) (ECF No. 65 Ex. A.)[3] In total, Rivera was on AC status on the RRL from January 20, 2015, until August 9, 2023, when he was transferred to the Management Control Unit at SCI Camp Hill, where he is housed today. (Rivera Decl. ¶ 9.) Despite the change in his designation, Rivera states, "no matter what I do, I will not be allowed back into the general population, even though I am program compliant and misconduct free." (*Id.* ¶ 17.)

Rivera generally alleges he experienced the following conditions beginning in January 2015: 10-15 minutes to eat meals alone in his cell; lower-quality food than inmates in general population; prohibited from participating in educational programs, organized activities, contact visitation with clergy and family members and physical contact with any visitor; mandatory strip search and potential body cavity searches every time he leaves and enters his cell; placement in restraints whenever he leaves his cell until he is secured in another area; limitations of personal property he can keep in his cell; deprivation of meaningful interaction with any other prisoners and with prison officials and staff members; prohibited from participating in religious activities; and vocational, recreational, or educations programs; and lodged in a cell with sealed doors.

---

[3] Rivera indicates that he was put on the IMU when he was transferred to SCI Phoenix in March 2022.

(DSMF ¶ 23.)

Defendants assert that there is no record evidence that the conditions alleged by Plaintiff represent are extreme deprivations or have a mutually enforcing effect that produces deprivation of a single, identifiable human need. (DSMF ¶¶ 24-25.) Rivera contends that whether his conditions of confinement constituted "extreme deprivations" or deprived him of an "identifiable human need" are matters that a jury must resolve. (PRDCSF ¶¶ 24-25.)

Further, according to Defendants, Rivera cannot produce competent admissible evidence that he incurred any physical injury due to his placement on the RRL or his prolonged confinement. (DSMF ¶¶ 26, 38-39.) In turn, Rivera claims that, at trial, he will testify that his damages include loss of weight and muscle mass; extensive loss of sleep; chronic headaches and diminished eyesight; and stress, sadness, anxiety, loneliness and hopelessness. (PRDCSF ¶¶ 26, 38-39; Rivera Decl. ¶¶ 11-15.)

Defendants further argue that there is no evidence that Wetzel or Bickell knew of any alleged unreasonable risk that Rivera's rights might be violated, or that Wetzel or Bickell was deliberately indifferent to any such risk. (DSMF ¶¶ 27-30.) Rivera notes, however, that Wetzel was aware of the effects of long-term solitary confinement on inmates. (PRDCSF ¶ 27.) And Bickell testified that some people are more vulnerable to the negative mental health effects of long-term placement on the RRL than others and he is generally aware of literature on this topic. (*Id.* ¶ 28.)

Rivera argues that even though Wetzel was subjectively aware of the risks associated with prolonged confinement on the RRL, he repeatedly voted to continue Rivera in administrative custody in the RHU between 2016 and 2021. In 2017 and 2021, despite the fact that Wetzel did not even sign the vote sheet, he remained on the RRL for another year. (PRDCSF

¶ 29.) Similarly, despite being aware of the effects of long-term solitary confinement, Bickell chose to continue Rivera on the RRL for the eighth straight year in 2022 without even speaking to him. (*Id.* ¶ 30.)

Defendants assert that Wetzel had a legitimate penological purpose for placing Rivera on the RRL because at the time he was placed on the RRL, he had violently assaulted a staff member. (DSMF ¶ 31.) And, they state, Bickell had a legitimate penological purpose for keeping Rivera on the RRL. (*Id.* ¶ 32.)[4] According to Rivera, however, whether Wetzel or Bickell was justified in keeping him on the RRL indefinitely is a disputed issue of fact for the jury to resolve. (PRDCSF ¶¶ 31-32.)

The parties also address the applicability of DC-ADM 804, the DOC grievance policy, to this dispute. According to Defendants, between December 2019 and December 2021, Rivera filed approximately sixty-one grievances under DC-ADM 804, only twenty-four of which were appealed to final review. (DSMF ¶¶ 33-37.) They contend that none of the grievances related to the unconstitutional conditions about which Rivera claims in this lawsuit. Thus, they assert, Rivera failed to exhaust his administrative remedies.

That said, Rivera claims that the cited grievances are not relevant here. He notes that DC-ADM 804 explicitly excludes challenges to placement or continuation on AC. *See* DC-ADM 804(1)(A)(7). Rivera notes that the only recourse an inmate in AC has to challenge issues related to the RRL is through DC-ADM 802, which requires an inmate to raise any issue about the duration of his AC custody during his regularly scheduled PRC review. However, although he

_____

[4] Defendants' support for this statement is an exhibit listing Rivera's misconduct history (ECF No. 60 Ex. 16), but they have not identified specific incidents that justified Bickell's decision. In fact, the RRL Vote Sheets from 2017, 2018 and 2019 contain identical language citing the 2015 assault on the corrections officer as the reason for Rivera's continued RRL placement (ECF No. 60 Exs. 8, 9, 10). In 2020, the RRL Vote Sheet referred to a misconduct from 2019 (*id.* Ex. 12), and that identical language was used in the Vote Sheets from 2021 and 2022 (*id.* Exs. 13, 14).

tried to appeal his RRL placement, his efforts were rejected by the Facility Manger and the Chief Hearing Examiner, both of whom stated that "in accordance with DC-ADM 802 Administrative Custody Procedures, appeal of placement on the Restricted Release List is not permitted." (Rivera Decl. ¶ 7.) Rivera claims that on several other occasions, he attempted to appeal the indefinite continuation of his AC status at SCI Fayette, SCI Benner Township, SCI Phoenix and SCI Greene, but his attempts were denied because appeals of an inmate's continuation on the RRL are not permitted. (*Id.* ¶ 8.)[5]

## III.  **Standard of Review**

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does

---

[5] Rivera also notes that, when Bickell was deposed, he admitted that there was no process by which Rivera could have challenged or appealed his RRL status.

not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Rsrv. Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Ctr., Pa.,* 242 F.3d 437, 446 (3d Cir. 2001).

## IV.    <u>Discussion</u>

### A.  <u>Individual Involvement of Beard</u>

As the Court of Appeals has held, "to be liable under § 1983, each individual defendant "must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

Here, it is undisputed that Beard left his position as DOC Secretary in 2010, five years before any of the events that are the subject of this Complaint. Because Beard had no personal involvement in the wrongdoing alleged by Rivera, he cannot be held liable.

Therefore, Defendants' motion for summary judgment will be granted with respect to Beard.

### B.  <u>Statute of Limitations</u>

Defendants argue that Rivera's claims are barred by the statute of limitations.[6]

"Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose. This is so for the

---

[6] Because the Court is granting summary judgment with respect to Rivera's Fourteenth Amendment claim, this analysis relates only to his Eighth Amendment claim.

length of the statute of limitations: It is that which the State provides for personal-injury torts."
*Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citations omitted).

Under Pennsylvania law, the statute of limitations for personal injuries is two years, 42
Pa. C.S. § 5524(2), and that period of limitations is applied to § 1983 claims. *Garvin v. City of
Phila.*, 354 F.3d 215, 220 (3d Cir. 2003). Thus, Defendants argue that, for Plaintiff's claims to be
timely, they must have accrued on or after December 20, 2021, two years before the Complaint
was filed.

Relying on the continuing violations doctrine, Rivera counters that there is no support for
Defendants' contention that a claim based on being held in solitary confinement over an
extended time is barred if not brought within two years after the confinement begins.[7] As noted
by the Third Circuit:

> The continuing violations doctrine is an "equitable exception to the timely filing
> requirement." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995).
> Thus, "when a defendant's conduct is part of a continuing practice, an action is
> timely so long as the last act evidencing the continuing practice falls within the
> limitations period; in such an instance, the court will grant relief for the earlier
> related acts that would otherwise be time barred." *Brenner v. Local 514, United
> Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir.1991).

*Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001). Though the doctrine has most often
been applied in employment discrimination claims, *see, e.g.*, *Mandel v. M & Q Packaging Corp.*,
706 F.3d 157, 165 (3d Cir. 2013), it can apply in other contexts.

As Judge Eddy held when presented with a statute of limitations defense to a prisoner
held in solitary confinement for over 22 consecutive years:

---

[7] The cases cited by Defendants related to specific events, not long-term RRL placement. *See
Runkle v. Pennsylvania, Dep't of Corr.*, 2013 WL 6485344, at *4 (W.D. Pa. Dec. 10, 2013)
(specific denial of medical care); *Basemore v. Vihlidal*, 605 F. App'x 105, 109 (3d Cir. 2015)
("Basemore's Z-Code status was removed in 2009, which means that his claim had to be filed by
2011. He did not file it until 2013.")

> [Plaintiff] has not alleged a series of distinct alleged wrongs but rather he has alleged that Defendants' conduct is part of a continuing practice. Based on this reasoning, the continuing violations doctrine is appropriate in this context and [Plaintiff] is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period.

*Shoatz v. Wetzel*, 2016 WL 595337, at *3 (W.D. Pa. Feb. 12, 2016). *See also Johnston v. Wetzel*, 431 F. Supp. 3d 666, 676 (W.D. Pa. 2019) (Lanzillo, M.J.) ("Because Johnston filed suit within two years of his release from solitary confinement, he is entitled to challenge all conduct that was a part of that alleged violation of his rights, even conduct that occurred outside the limitations period.")

It is undisputed that Rivera was held in AC status on the RRL in solitary confinement for eight and a half years and brought suit while still in that status. Because his claims are based on a continuing violation over many years, he is not barred from asserting them based on conduct that occurred outside the limitations period.[8]

Therefore, Defendants' statute of limitations argument is unavailing.

C.  Exhaustion of Remedies

Defendants contend that Rivera has not properly exhausted his claims before bringing suit. Rivera disputes this assertion because he claims that remedies were unavailable to him. Whether a prisoner has exhausted administrative remedies is a question of law that is determined by the court, even if that determination requires the resolution of disputed facts. *Small v. Camden County*, 728 F.3d 265, 269 (3d Cir. 2013).

The Prison Litigation Reform Act ("PLRA") requires that an action about prison conditions under Section 1983 by a prisoner cannot be brought until available administrative remedies have been exhausted. 42 U.S.C. § 1997(e)(a). The Supreme Court has held that

---

[8] By contrast, to the extent that Rivera asserts that his original placement on the RRL in 2015 was improper, this claim is barred by the statute of limitations.

prisoners must exhaust their administrative remedies before bringing suit, even if the state does not provide the kind of remedy they seek. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *Booth v. Churner*, 532 U.S. 731, 739 (2001); *Nyhuis v. Reno*, 204 F.3d 65 (3d Cir. 2000). The Court has further held that the PLRA requires "proper exhaustion," that is, exhaustion as stated in the procedures described, in a timely manner and so on. *Woodford v. Ngo*, 548 U.S. 81 (2006). *See also Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (explaining that proper exhaustion requires a prisoner to "comply with all the administrative requirements").

It is not the plaintiff's burden to affirmatively demonstrate exhaustion. *Jones v. Bock*, 549 U.S. 199, 217 (2007) (concluding that "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Instead, the failure to exhaust must be asserted and proven by the defendant. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

"Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016).

While the DOC has adopted a three-part grievance process that inmates must follow, DC-ADM 804 excludes certain issues from the inmate grievance system, including "the reasons for placement in administrative custody," which must be addressed through DC-ADM 801, "Inmate Discipline," and/or DC-ADM 802, "Administrative Custody Procedures." DC-ADM 804(1)(A)(7).

DC-ADM 802 includes a reciprocal provision, which mandates that "[a]ll issues concerning . . . the duration of [an inmate's] AC custody must be addressed through the procedures set forth in this procedures manual and may not be addressed through the procedures

set forth in Department policies DC-ADM 801, 'Inmate Discipline' or DC-ADM 804, 'Inmate

Grievance System.' " DC-ADM 802(2)(D)(11). DC-ADM 802 also provides that "[c]onditions

or other circumstances of inmate's AC Status, other than reason or duration, must be addressed

through the grievance process set forth in Department Policy DC-ADM 804." DC-ADM

802(2)(D)(12).[9]

> As Judge Lanzillo noted after summarizing these provisions:
>
> Thus, DOC policies require a prisoner to follow the grievance procedures of DC-ADM 804 if the complaint is about the "[c]onditions or other circumstances of [the] inmate's AC Status," but direct him to follow DC-ADM 802 (and forbid resort to DC-ADM 804) if the complaint is about the "duration" of the inmate's AC status. Here, the conundrum faced by [Plaintiff] is that his claim necessarily and inextricably intertwines the duration of his AC status and the conditions of his AC status.

*Pelzer v. Pennsylvania Dep't of Corr.*, 2024 WL 844379, at *2 (W.D. Pa. Feb. 28, 2024). Judge

Lanzillo concluded that the DOC has created an ambiguity in its policies that rendered them so

opaque as to be "unavailable" to a prisoner who seeks to challenge long-term RRL placement.

*Id.* at *3. *See also Johnston*, 431 F. Supp. 3d at 676 n.7 ("Johnston had no remedies or grievance

procedures to challenge his solitary confinement.")

Rivera testified that he tried to appeal his RRL placement, but his efforts were rejected by

the Facility Manger and the Chief Hearing Examiner, both of whom stated that "in accordance

with DC-ADM 802 Administrative Custody Procedures, appeal of placement on the Restricted

Release List is not permitted." (Rivera Decl. ¶ 7.) On several other occasions, he sought to

appeal the indefinite continuation of his administrative custody status on the RRL at SCI Fayette,

SCI Benner Township, SCI Phoenix and SCI Greene, all of which were denied because appeals

of RRL continuation are not permitted. (*Id.* ¶ 8.) As Rivera notes, Bickell admitted during his

---

[9] DC-ADM 802(C) indicates that an inmate may appeal the initial decision to be placed on AC status, but not the ongoing long-term placement.

deposition that there was no process by which an inmate could challenge or appeal his RRL status. (Bickell Dep. 22:20-24) (ECF No. 65 Ex. C.)

Defendants have not met their burden to establish that Rivera failed to exhaust available remedies. Indeed, the current record shows that there were no available remedies by which he could challenge his continued AC status and RRL placement. As a result, Defendants are not entitled to judgment in their favor based on a failure to exhaust administrative remedies.

D. Fourteenth Amendment Claim

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In analyzing a procedural due process claim, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). If the asserted interest falls within the protections of the Due Process Clause, the second step is to determine whether the plaintiff was afforded "all of the process he was due." *Id.*

Liberty interests arise from the Constitution or "from an expectation or interest created by state laws." *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 558-59 (3d Cir. 2017) (quoting *Wilkinson*, 545 U.S. at 221). In the prison context, a protected liberty interest arises only where a restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In determining whether a condition of confinement creates a protected liberty interest, a court must consider: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Shoats*, 213

F.3d at 144. Employing that two-step inquiry in *Shoats*, the Court of Appeals determined that an eight-year term in solitary confinement created a protected liberty interest. *Id.*[10]

Defendants correctly assert that the placement on the RRL does not implicate a liberty interest. *See Huertas v. Sec'y Pa. Dep't of Corr.*, 533 F. App'x 64, 67 n.6 (3d Cir. 2013) ("To the extent that Huertas' due process claim is based on his placement on the RRL, a list of inmates who may only be released from administrative custody upon prior approval of the Secretary of Corrections, we agree with the District Court that this does not implicate a constitutionally protected due process right."). *See also Bowen v. Ryan*, 248 F. App'x 302, 304 (3d Cir. 2007); *Washington-El v. Beard*, 2013 WL 1314528, at *9 (W.D. Pa. Feb. 26, 2013), *report and recommendation adopted*, 2013 WL 1314521 (W.D. Pa. Mar. 28, 2013), *aff'd*, 562 F. App'x 61 (3d Cir. 2014).

Here, however, Rivera challenges the review process he received while on AC status on the RRL over a number of years, not his initial placement on it. As the Court of Appeals held when presented with a similar claim in *Williams v. Secretary Pennsylvania Department of Corr.*, 848 F.3d 549 (3d Cir. 2017):

> Plaintiffs have shown atypical hardship. In *Sandin*, the Court found that thirty days in solitary confinement did not give rise to a protected interest. In *Wilkinson*, the Court found that essentially indefinite confinement with the extreme deprivations imposed there did give rise to a protected interest. The hardship Plaintiffs experienced here is far more analogous to the extreme deprivation in *Wilkinson* than the much shorter and less severe infringement on liberty that was present in *Sandin*. Both Plaintiffs remained in solitary confinement on death row for years—many multiples of Sandin's thirty days—after the initial justification for subjecting them to such extreme deprivation (their death sentences) ceased to exist. Plaintiffs' isolation on death row lasted six and eight years. We see no meaningful distinction between those periods of extreme deprivation and the eight

---

[10] In *Shoats*, the court noted that a Special Assistant to the DOC Commissioner had testified that "he would be concerned about the psychological damage to an inmate after *only 90 days* of such confinement and would generally recommend transfer to the general population after 90 days as a consequence." *Id.*

years of solitary confinement that we concluded in *Shoats* was "not only atypical, but [ ] indeed 'unique.' " Although we do not suggest that it would be considered atypical under *Sandin*, we do note that researchers have found that even *a few days* in solitary confinement can cause cognitive disturbances.

*Id.* at 561-62 (footnotes omitted). In *Shoats*, the Court of Appeals held that being held in administrative custody for eight years with no prospect of immediate release in the near future imposes an "atypical hardship" in relation to the ordinary incidents of prison life and creates a liberty interest. 213 F.3d at 144.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "The determination of what process is 'due' is 'not to be found in statutes . . . [but] is a question of federal constitutional law." *McDaniels v. Flick*, 59 F.3d 446, 458 (3d Cir. 1995) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

"A fundamental requirement of due process is 'the opportunity to be heard.'" *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). An "opportunity to be heard" must be meaningful and not merely technical. *Brown v. Pennsylvania Dep't of Corr.*, 290 F. App'x 463, 465-66 (3d Cir. 2008) (citing *Sourbeer v. Robinson*, 791 F.2d 1094 (3d Cir. 1986)). This opportunity "must be granted at a meaningful time and meaningful manner." *Id.*

As noted in *Shoats,* administrative custody separates those inmates whose presence in the general population poses a threat. There is no limit to the time period during which an inmate is in AC assuming that the requirements of due process are met. 213 F.3d at 142, 144. *See also Huertas,* 533 F. App'x at 67 ("There is no limit to the amount of time an inmate may be housed in administrative custody.")

It is uncontroverted that during the years at issue, the PRC met with Rivera every 90 days, during which, as he admits, he was able to be heard. The PRC then conducted an annual

review and completed a vote sheet regarding whether Rivera should remain on the RRL. In each year, the PRC recommended maintaining Rivera on the RRL. (Wetzel Dep. 39:6-22) (ECF No. 65 Ex. E.) Prior to Wetzel's final review, the facility's Deputy Superintendent and Superintendent, along with the Regional Deputy Secretary and Executive Deputy Secretary all "voted" on whether the inmate should remain on the RRL. (*Id.* at 41:3-9.) The completed "vote sheet," which included a rationale and comments, was provided to Wetzel, the sole decision maker, who reviewed the votes, commented and decided whether to release an inmate from the RRL. In order to decide whether an inmate should remain in solitary confinement, Wetzel stated that he tried to "synthesize everyone's recommendation and come up with the best decision for the Department." (*Id.* at 16:1-3.) In 2017 and 2021, Wetzel failed to sign the form confirming that Rivera would remain on the RRL.

Rivera notes that, until a policy change in April 2022, inmates like him who were placed on the RRL were held in AC indefinitely unless released by Wetzel. (Wetzel Dep. 15:2-9.) Thus, during the first six years of Rivera's placement on the RRL, only Wetzel, the Secretary of the DOC, could have removed him from the RRL and allowed him into the general population. (Wetzel Dep. 15:2-3.) Absent that authorization, an inmate was held in AC indefinitely. (*Id.* at 15:2-9.)

In April 2022, the DOC changed its policy to replace the Secretary of the DOC with the EDSI as the sole decision maker concerning RRL continuation. DC-ADM 802(1)(C)(1). EDSI Bickell testified that allowing the inmate to speak to the Secretary under the prior policy or to him after the policy was changed was not part of the process. (Bickell Dep. 19:1-20:19.) Thus, neither spoke to Rivera as part of their RRL determination. (*Id.* at 24:21-24.)

Defendants argue that even if being kept on the RRL for eight years constituted an atypical hardship, Rivera received all the process he was due when the PRC voted annually to continue him on the RRL. Defendants also contend, however, that "Rivera had hearings and periodic reviews of his administrative custody status pursuant to the provisions set forth in DC-ADM 802" (ECF No. 58 at 12), which they describe as "a procedure whereby an inmate's status is assessed every 90 days through periodic review" (*id.* at 20.)[11]

In *Shoats*, the Court of Appeals held that the process the plaintiff received—the ability to appeal the PRC's decision to be placed in administrative custody to the superintendent, the PRC's review every 30 days which included a personal interview with Shoats, the requirement that a report be filed after 90 days with Regional Deputy Commissioner and the fact that Shoats participated in many of the PRC reviews—met the requirements of due process. 213 F.3d at 145-46. *See also Bowen v. Ryan*, 248 F. App'x 302, 304-05 (3d Cir. 2007) ("Bowen was afforded an initial opportunity to be heard upon confinement, and periodic review of his status. Like the District Court, we reject [his] conclusory allegations that the periodic reviews by the PRC were rote or meaningless."); *Delker v. McCullough*, 103 F. App'x 694, 695 (3d Cir. 2004) ("We agree with the District Court that the appellees gave Delker meaningful periodic reviews, and thus procedural due process, and were entitled to summary judgment.").

---

[11] Defendants' Concise Statement and attached exhibits relate only to the annual process of reviewing Rivera's placement on the RRL, not reviews of his AC status. (DSMF ¶¶ 12, 15-20.) However, Rivera testified during his deposition that he had meetings with the PRC every 90 days during which he could ask questions and receive responses. (ECF No. 65 Ex. A at 23.) Bickell testified that inmates can challenge their RRL placement during these periodic meetings. (ECF No. 65 Ex. C at 3; ECF No. 65 Ex. D at 7.) They could also provide a writing expressing their views to the central office, unit teams, the PRC or the superintendent. (*Id.*)

As the Third Circuit noted in another case:

> In any event, even assuming that Bracey suffered a deprivation of a protected liberty interest by virtue of his extended placement on the RRL, the periodic review offered to Pennsylvania inmates who are indefinitely confined in administrative confinement comports with procedural due process, *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) and does so with respect to placement on the RRL as well. Department of Corrections policy provides that the status of inmates in the SMU must be reviewed every 90 days. Bracey's placement on the RRL merely added another layer of periodic review, review that he actually received, relating to whether he should be released to the general population. It did not involve a deprivation of liberty as to which any additional procedural due process would attach.

*Bracey v. Sec'y Pa. Dep't of Corr.*, 686 F. App'x 130, 135-36 (3d Cir. 2017).

Rivera argues that some courts have rejected the proposition that annual votes by the PRC to continue prisoners on the RRL, at which they cannot participate, are enough to satisfy the requirements of due process. For example, in *Johnston*, Judge Lanzillo concluded that:

> Here, the record falls short of establishing as a [matter] of law that Johnston's protracted solitary confinement received meaningful review. Indeed, on the existing record, a jury could reasonably find that the reviews that occurred were pro forma and meaningless. This conclusion is bolstered by the absence of meaningful criteria to guide Wetzel's decision on whether to continue an inmate on the RRL and any meaningful opportunity for the inmate to be heard on this issue.

431 F. Supp. 3d at 684-85. *See also Wayne v. Clark*, 2022 WL 17993131, at *8 (E.D. Pa. Dec. 29, 2022).

In *Johnston*, however, the court was not presented with and did not discuss the 90-day reviews by the PRC or the relationship between those reviews and the annual reviews of the prisoner's RRL status by the PRC and the final decision maker. In fact, in a more recent case, Judge Lanzillo noted that the Court of Appeals in *Bowen* had rejected mere conclusory allegations that the 90-day PRC reviews are "perfunctory" or "meaningless" and stated that:

> Rather than simply labeling the PRC reviews as perfunctory, Blount has alleged specific facts suggesting that the PRC rarely discussed his RRL status during

reviews, disregarded his mental and health concerns, failed to provide him with an opportunity to challenge his status or advocate on his own behalf, and issued generic and conclusory explanations in support of its decisions. These allegations are sufficient to survive dismissal at the Rule 12(b)(6) stage.

*Blount v. Ackrom*, 2024 WL 2834034, at *7 (W.D. Pa. June 4, 2024). *See also Watson v. Wetzel*, 2024 WL 5096209, at *10 (E.D. Pa. Dec. 12, 2024) ("Defendants argue, and Watson does not meaningfully dispute, that Defendants complied with this policy by giving Watson notice of his initial RRL approval, reviewing his RRL status every 90 days, and assessing Watson's RRL status annually.")

In this case, which is being reviewed upon a fully developed record, Rivera does not challenge that he had periodic meetings with the PRC or suggest that they were perfunctory. Indeed, as pleaded in his Amended Complaint, the basis for his Fourteenth Amendment claim is that he was entitled to due process with respect to the opportunity to be heard by the final decision makers, who were Wetzel and Bickell. Further, in his response to Defendants' Concise Statement, he states that " the issue is not whether 'program reviews' were provided, but whether the RRL process as applied to Mr. Rivera satisfied the requirements of due process, including the opportunity to be heard by the decision maker." (PRDCSF ¶ 21.)

The Court finds that through the two levels of review, Rivera received the process that was due. Rivera received the periodic review for inmates in AC through meetings every 90 days, during which he had the opportunity to be heard.[12] Because he was on the RRL, he also received a review of his status annually. Rivera cites no authority to support his argument that due process is not satisfied unless he was allowed to personally meet with the final decision maker. Wetzel and Bickell received and reviewed the recommendations of correctional officials who were the

---

[12] Plaintiff does not assert that he was deprived of due process about his AC status. Even if he had done so, however, neither Wetzel nor Bickell had any personal involvement with respect to the periodic reviews at the correctional institution level.

most knowledgeable about Rivera's status, had met with him throughout the year and provided commentary about the basis for their annual vote.

Therefore, Defendants Wetzel and Bickell are entitled to judgment in their favor with respect to the Fourteenth Amendment claim.

E.   Eighth Amendment Claim

Rivera alleges that the conditions to which he was subjected violated his right to be free from cruel and unusual punishment under the Eighth Amendment. Defendants contend that the record does not support this claim.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986). The Supreme Court has interpreted this prohibition, among other things, to impose affirmative duties on prison officials to "provide humane conditions of confinement," *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Constitution "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities, are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (citations omitted).

"A properly stated Eighth Amendment claim must allege a subjective and objective element. First, it must appear from the complaint that the defendant official acted with a 'sufficiently culpable state of mind.' Second, the conduct must have been objectively 'harmful enough,' or 'sufficiently serious' to violate the Constitution." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) (citations omitted).

This evaluation is made with reference to "contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Conditions that jeopardize the physical or mental health of

inmates may violate the Eighth Amendment. *See Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992), *superseded on other grounds by statute*, Prison Litigation Reform Act, 42 U.S.C. § 1997 et seq.)).

A prison official acts with deliberate indifference to a prisoner's needs only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The Court of Appeals has held that:

> when evaluating Eighth Amendment allegations concerning segregated housing units, "[t]he touchstone is the health of the inmate." Further, we explained that "[t]he duration and conditions of segregated confinement cannot be ignored in deciding whether such confinement meets constitutional standards." Highly relevant to this analysis is that prisons may not punish in a way that "threatens the physical and mental health of prisoners."

*Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 517 (3d Cir. 2024) (quoting *Young*, 960 F.2d at 364).

The Court of Appeals has further held that: "It is well established in both case law and scientific and medical research that prolonged solitary confinement . . . poses a substantial risk of serious psychological and physical harm." *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020). Specifically:

> Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results. Additional studies included in the aforementioned meta-analysis further "underscored the importance of social contact for the creation and maintenance of 'self.' " In other words, in the absence of interaction with others, an individual's very identity is at risk of disintegration.

*Id.* (quoting *Williams*, 848 F.3d at 566). In *Porter*, Plaintiff presented evidence that he had in fact experienced detrimental effects from extended solitary confinement. The court concluded that:

> That extreme duration of solitary confinement has had severe detrimental impacts on Porter, impacts that track the robust and growing scientific and legal understanding of the harms of prolonged solitary confinement. Viewing Porter's deprivations according to "contemporary standards of decency," *Estelle*, 429 U.S.

at 103, 97 S. Ct. 285, Porter has certainly provided enough evidence to survive
summary judgment.

*Id.* at 444. *See also Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996) ("Relevant considerations
include the length of confinement, the amount of time prisoners must spend in their cells each
day, sanitation, lighting, bedding, ventilation, noise, education and rehabilitation programs,
opportunities for activities outside the cells, and the repair and functioning of basic physical
activities such as plumbing, ventilation and showers.")

Defendants contend that Rivera has not established that he has been deprived of basic
human needs. They cite *Johnson v. Wetzel*, in which the court noted that "a prisoner's placement
in solitary confinement does not, in itself, violate the Constitution." *Johnson v. Wetzel*, 209 F.
Supp. 3d 766, 777 (M.D. Pa. 2016). But in *Johnson*, the court added:

> However, the Supreme Court of the United States has admonished that duration of
> confinement "cannot be ignored" in determining whether challenged conditions
> withstand constitutional scrutiny. *Hutto v. Finney*, 437 U.S. 678, 686, 98 S. Ct.
> 2565, 57 L.Ed.2d 522 (1978); *Young*, 960 F.2d at 364. Courts must be cognizant
> of the "fundamental difference" between deprivation of discretionary privileges
> that a prisoner in general population may enjoy and deprivation "of the basic
> necessities of human existence." *Young*, 960 F.2d at 364. A number of courts
> have resolved that the denials of basic human needs such as social interaction,
> environmental stimuli, exercise, and sleep which attend long-term isolation run
> afoul of the Eighth Amendment.

*Id.* (citations omitted).[13]

Courts have recognized that prolonged periods of solitary confinement deprive inmates of
"exercise, sleep, social contact and interaction, and environmental stimulation . . . [which are]
basic human needs." *Johnston*, 431 F. Supp. 3d at 678 (citations omitted). *See also Wayne,* 2022

---

[13] Defendants also cite *Johnson v. Pennsylvania Department of Corr.*, 2019 WL 2005631, at *2
(M.D. Pa. May 7, 2019), for the proposition that a court found the DOC's AC regime to be
constitutional. However, the Court of Appeals concluded that "Johnson stated a viable claim" at
the motion to dismiss stage. *Johnson v. Pennsylvania Dep't of Corr.*, 846 F. App'x 123, 128 (3d
Cir. 2021).

WL 17993131, at *5 (conditions akin to those Rivera has faced resulted in Wayne suffering from "anxiety, distress, and despair," and therefore constituted objectively serious conditions of confinement); *Shoatz*, 2016 WL 595337, at *7 (prolonged years in solitary confinement caused inmate to "experience serious mental health harms, including years of chronic depression, bouts of suicidal ideation, high levels of anxiety, severe difficulty concentrating, short term memory loss, fear of leaving his cell, depression, emotional numbing, and an inability to form intimate relationships.").

Rivera states that the conditions he sustained are substantially similar to those suffered by the plaintiff in *Johnston*. He asserts that he was only able to shower three days per week; his cell was illuminated 24 hours a day; there was extreme noise; the constant checks by corrections officers at all times of the day and night made sleep extremely difficult and he experienced sleep disruption; his mental health was negatively impacted due to the obstruction of light into his cell and a limited view of the outside; his cell conditions caused a disorienting sensation that there was no transition from day to night; he had very little room in his cell to exercise or walk around; he was restricted to one hour per weekday in an exercise cage in the "yard"; and on weekend days, he was restricted to his cell at all times. (Am. Compl. ¶ 29.)

As for the issue of deliberate indifference, the Court of Appeals has held that the substantial risks of prolonged solitary confinement are "obvious," "longstanding, pervasive, well-documented, [and] expressly noted by prison officials in the past" and "correctional officers have publicly acknowledged these harms." *Porter*, 974 F.3d at 445-46. As Rivera notes, many cases have concluded that Wetzel knew the risks of prolonged isolation. *See Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017); *Johnston*, 431 F. Supp. 3d at 680-81; *Johnson*, 209 F. Supp. 3d at 779; *Shoatz*, 2016 WL 595337, at *9. With respect to Bickell, he testified that he was

generally aware of the negative mental health effects of long-term placement on the RRL. (Bickell Dep. 73:14-74:9.)

Thus, there are material issues of fact that preclude summary judgment regarding whether Defendants acted with a "sufficiently culpable state of mind" as it relates to Rivera's AC status, and if the conditions experienced by Rivera were serious enough to violate the Constitution.

That leaves Defendants' assertions that they are entitled to qualified immunity, or that Rivera has failed to demonstrate the existence of damages.

### 1. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The ultimate question is whether the state of the law when the offense occurred gave Defendants "fair warning" that their acts were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Defendants contend that no case has clearly established an inmate's right not to be held in solitary confinement for an extended period of time.[14] However, the issue is not simply the duration of the confinement, but the conditions of that confinement. For example, in *Johnston*, Judge Lanzillo noted that:

---

[14] Given the Court's conclusion about the Fourteenth Amendment claim, it is unnecessary to address qualified immunity as to that claim.

> since 2000, the Court of Appeals has determined that eight years in administrative custody, where, for example, an inmate is confined to his cell for 23 hours each day, eats meals by himself, and is prohibited from participating in organization activities, is atypical and implicates a protected liberty interest. *Shoats*, 213 F.3d at 144.

431 F. Supp. 3d at 685. *See also Wayne*, 2022 WL 17993131, at *10 (rejecting defense of qualified immunity because it was well established that prolonged solitary confinement satisfies the objective prong of the Eighth Amendment analysis); *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 517 (3d Cir. 2024); *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020).

For the reasons outlined above and based on the record in this case, there are genuine issues of material fact as to whether Rivera has been denied his Eighth Amendment rights. Therefore, neither Wetzel nor Bickell is entitled to be dismissed from the Eighth Amendment claim based on qualified immunity.

### 2. Availability of Damages

Defendants argue that, even if Rivera could establish liability, he has no evidence of physical injury or a basis for recovering punitive damages. Rivera responds that there are disputed issues of fact about his damages.

The PLRA provides that:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

42 U.S.C. § 1997e(e).

The Supreme Court has "held that substantial damages may only be awarded to compensate for actual injury suffered as a result of the violation of a constitutional right." *Allah v. Al-Hafeez*, 226 F.3d 247, 250 (3d Cir. 2000) (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477

U.S. 299, 308 (1986)). In *Allah*, the court concluded that:

> We see no construction of Allah's complaint that would save his claims for compensatory damages from the bar imposed by § 1997e(e). Allah seeks substantial damages for the harm he suffered as a result of defendants' alleged violation of his First Amendment right to free exercise of religion. As we read his complaint, the only actual injury that could form the basis for the award he seeks would be mental and/or emotional injury. Under § 1997e(e), however, in order to bring a claim for mental or emotional injury suffered while in custody, a prisoner must allege physical injury, an allegation that Allah undisputedly does not make. Accordingly, Allah's claims for compensatory damages are barred by § 1997e(e) and were appropriately dismissed.

*Id.* at 250-51. *See also Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003) ("We also agree with other circuits that have read [§]1997e(e) to require more than a *de minimis* physical injury before an emotional injury may be alleged.")[15]

As an initial matter, Rivera has claimed abnormal weight loss as a result of poor food quality and lack of exercise. Some courts have concluded that such abnormal weight loss can constitute a physical injury. *See Friedmann v. Parker*, 573 F. Supp. 3d 1221, 1232 (M.D. Tenn. 2021); *Cheatham v. Haye*, 2020 WL 3481645, at *2 (E.D. Mich. June 26, 2020). He also asserts that he suffered from chronic headaches and diminished eyesight. Whether he can prove more than *de minimis* physical injury, which would allow him to seek damages for emotional injuries, cannot be concluded based on the current record.

In any event, even if Rivera could not establish a physical injury, he may still be able to recover nominal damages and/or punitive damages. Nominal damages may be recovered for constitutional violations, even if a plaintiff does not request them. *Allah*, 226 F.3d at 251. "Punitive damages may also be awarded based solely on a constitutional violation, provided the proper showing is made." *Id. See also Doe v. Delie*, 257 F.3d 309, 314 n.3 (3d Cir. 2001)

---

[15] Other courts have permitted the award of compensatory damages for non-mental and non-emotional injuries arising out of constitutional violations. *See, e.g.*, *Aref v. Lynch*, 833 F.3d 242, 264-65 (D.C. Cir. 2016) (describing the split of opinion on this issue).

(Section 1997e(e) "does not bar claims seeking nominal damages to vindicate constitutional rights, nor claims seeking punitive damages to deter or punish egregious violations of constitutional rights."); *Keenan v. City of Philadelphia*, 983 F.2d 459, 469-70 (3d Cir. 1992). Rivera has alleged violations of his Eighth Amendment rights, for which he could seek damages which would not be barred by Section 1997e(e).

Under the prevailing case law, Rivera potentially could recover nominal damages and punitive damages for the constitutional violation alleged. He might also be able to recover compensatory damages based on his alleged physical injuries. Therefore, summary judgment based on Defendants' assertion that Rivera cannot recover damages will be denied.

## V.    <u>Conclusion</u>

For the reasons explained above, Defendants' motion for summary judgment will be granted in favor of Beard, granted with respect to the Fourteenth Amendment claim, and denied in all other respects.

An appropriate order follows.

Dated: February 4, 2025                    /s/Patricia L. Dodge
                                           Patricia L. Dodge
                                           United States Magistrate Judge